# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VEN OUK,<br><br>        *Plaintiff,*<br><br>   v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>        *Defendant.* | CIVIL ACTION<br>NO. 16-5509 |

**PAPPERT, J.**                                                                                  April 20, 2018

## MEMORANDUM

Ven Ouk seeks judicial review of the Commissioner of Social Security's denial of her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Upon consideration of the administrative record, Magistrate Judge Richard A. Lloret's Report and Recommendation (ECF No. 13), and the parties' Objections and Responses thereto (ECF Nos. 14 & 16), the Court overrules Ouk's objections, denies her request for review and affirms the Commissioner's decision.

I[2]

Ouk filed an application for SSI on July 8, 2013. (Administrative Record ("R.") at 82, 133.) She was thirty-five years old at the time. (*Id.*) Her highest level of education is the eleventh grade, she does not have her GED and she does not have any vocational

---

[1]     Nancy A. Berryhill became the Acting Commissioner for Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill should be substituted for the former Acting Commissioner, Carolyn Colvin, as the defendant in this action.

[2]     Because Ouk does not object to Judge Lloret's factual and procedural recitations, the Court draws its factual and procedural history largely from those portions of the R & R. Pl.'s Obj., ECF No. 14.

1

training. (R. at 37–38.) She is currently unemployed but has experience working for short periods of time as a maid, warehouse machine operator (mail feeder), caregiver and nail technician. (R. at 22, 36, 38–43, 150, 155.)

Ouk claims to be disabled, with a disability onset date of December 31, 2006, due to depression, anxiety, social withdrawal, excessive avoidance, trauma, eating problems, sleeping problems, seeing things and hearing voices. (R. at 72–73, 133, 148.) She was hospitalized in May of 2013 after attempting suicide by overdosing on alcohol and prescription medication. (R. at 47.) Following her attempt, she began attending regular therapy sessions at Warren E. Smith Health Systems (WES) and was diagnosed with major depressive disorder. (R. at 49, 308.) Ouk is prescribed Zoloft and Seroquel, which help control her depression, anger and anxiety. (R. at 46, 48.) Ouk claims that she is unable to work because her depression and anxiety make her "unsociable with the public." (R. at 164.)

Ouk's application was denied on October 8, 2013, and she thereafter requested a hearing before an Administrative Law Judge. (R. at 85–89.) ALJ Linda Thomasson held the hearing on April 2, 2015. (R. at 13, 28.) Ouk testified that she is unable to work because she is "scared of everything," "can't socialize [with] other people," and hears voices on a daily basis. (R. at 45–46.) After considering the evidence, the ALJ denied relief on July 17, 2015. (R. at 13–24.) Applying the five-step sequential evaluation process,[3] the ALJ determined that Ouk was not "disabled" as defined by the

---

[3] The Commissioner has established a five-step process to determine whether claimants are disabled. 20 C.F.R. § 416.920(a). At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity." *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004) (citation omitted); 20 C.F.R. § 416.920(b). If not, the ALJ proceeds to step two where he or she must determine whether the claimant has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic

2

Social Security Act. (R. at 13–24.) At steps one and two, the ALJ concluded that Ouk has not engaged in substantial gainful activity since July 8, 2013, the date she applied for SSI,[4] and that she suffers from a mood disorder, a severe impairment. (*Id.*) At step three, the ALJ found that Ouk's impairment did not meet or medically equal the severity of one of the listed impairments, namely Listing 12.04 Affective Disorders, because Ouk had only moderate restrictions in the activities of daily living, social functioning, and concentration, persistence or pace. (R. at 16–17.)

At step four, the ALJ found that Ouk had the RFC to perform a full range of work at all exertional levels, albeit with the following specified non-exertional limitations: preforming no more than simple, routine and repetitive tasks, making no more than simple work-related decisions, limited to no more than occasional interaction with supervisors, co-workers and the public, and limited to tolerating no more than occasional changes in routine work setting. (R. at 17.) Given this RFC, the ALJ concluded that Ouk could not perform her past relevant work. (R. at 22.) At step five, however, the ALJ found that Ouk's RFC permits her to work jobs that exist in significant numbers in the national economy, for example, as a laundry worker. (R. at

---

work activities." *Ramirez*, 372 F.3d at 550 (citation omitted); 20 C.F.R. § 416.920(c). If the claimant successfully demonstrates a "severe impairment," the ALJ proceeds to step three to assess whether the impairment meets or medically equals one of the listed impairments; if so, the claimant qualifies for disability. *Ramirez*, 372 F.3d at 550–51 (citation omitted); 20 C.F.R. §416.920(d). If, however, the impairment does not meet or medically equal a listed impairment, the inquiry proceeds to step four where the ALJ determines whether the claimant has the "residual functional capacity" (RFC) to perform any prior relevant work. *Ramirez*, 372 F.3d at 551; 20 C.F.R. §416.920(e). If the claimant can perform any prior relevant work, he or she will not be found disabled. *Ramirez*, 372 F.3d at 551. If not, the fifth step requires the ALJ to consider "vocational factors" (age, education and past work experience) to determine whether the claimant is capable of performing other jobs existing in the national economy. *Id.* (citing 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)).

[4] Because Social Security Income is not payable prior to the month following the month in which the application was filed, the operative date for assessing disability in this case is July 8, 2013. (R. at 13.)

23.) The ALJ thus found that Ouk was not disabled within the meaning of the statute and not entitled to benefits. (R. at 24.)

The ALJ's decision became final after the Appeals Council denied Ouk's request for review on September 26, 2016. (R. at 1–6.) Ouk filed this action on October 20, 2016, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF Nos. 1 & 3.) Ouk argued that the ALJ: (1) erroneously rejected the opinions of Ouk's treating and examining psychiatrist Dr. Ola; (2) erroneously found Ouk's testimony not entirely credible; (3) did not adequately explain her RFC determination; and (4) violated what Ouk believes is her absolute due process right to cross-examine the state agency consultant, Dr. Diorio. (*See generally* Pl.'s Br., ECF No. 9.)

On November 8, 2017, Judge Lloret issued his R & R rejecting each argument and recommending that Ouk's request for review be denied and judgment be entered in favor of the Commissioner. (ECF No. 13.) Ouk objects to each of Judge Lloret's conclusions, reiterating her initial arguments and requiring the Court to review her arguments *de novo*. 28 U.S.C. § 636(b)(1); *see also Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). Pursuant to Section 636(b)(1), the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

II

The Court's role on review is to determine whether the ALJ's determinations were supported by substantial evidence. 42 U.S.C. § 405(g); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence is evidence which a

4

"reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotation marks and citation omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)).

In reviewing the ALJ's decision, the Court is not permitted to re-weigh the evidence or substitute its own conclusions for those reached by the ALJ. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) (citation omitted). "The ALJ resolves conflicts in the evidence, determines the evidence's credibility, and assigns the appropriate weight to be given such evidence." *D'angelo v. Colvin*, No. 14-6594, 2016 WL 930690, at *2 (E.D. Pa. Mar. 11, 2016) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 2004)). "If the ALJ's decision is supported by substantial evidence, the Court may not set it aside even if the Court would have decided the factual inquiry differently." *Santiago v. Barnhart*, 367 F. Supp. 2d 728, 732 (E.D. Pa. 2005) (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)).

The ALJ's decision must "present a sufficient explanation of the final determination in order to provide the reviewing court with the benefit of the factual basis underlying the ultimate disability finding." *D'angelo*, 2016 WL 930690, at *1 (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)). The decision need only discuss the most relevant evidence concerning a claimant's disability, "but it must provide sufficient discussion to allow the reviewing Court to determine whether its rejection of potentially significant evidence was proper." *Id.* (citing *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008)).

III

A

Ouk objects to the ALJ's decision to give great weight to the opinion of Melissa Diorio, Psy.D., a non-examining consultant, while giving the opinion of her treating and examining psychiatrist Conrada C. Ola, M.D., "no more than partial weight." (Pl.'s Objs. to R. & R. at 1, ECF No. 14; Pl.'s Br. at 3, 7.) The ALJ's decision to do so was supported by substantial evidence and will not be disturbed.

i

Generally, the opinions of treating medical professionals are given more weight than that of non-treating or non-examining medical professionals. 20 C.F.R. § 416.927(c)(2); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight[.]"). If a treating professional's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it is afforded controlling weight. 20 C.F.R. § 416.927(c)(2). If, however, the opinion does not meet this standard, the ALJ will determine how much weight the opinion should be given after considering: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidentiary support for the opinion; (4) the consistency with the remainder of the record; and (5) whether the medical issues in question are related to the physician's area of specialty. 20 C.F.R. § 416.927(c)(1)–(5).

Further, "[w]here, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but

'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 427); *see also Brown*, 649 F.3d at 196 ("[The] ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw [his or her] own inferences." citing *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986)). "In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 427).

Ultimately, the ALJ—not treating or examining physicians or State agency consultants—must make the determination of the claimant's RFC. *Chandler*, 667 F.3d at 361. "Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, 'the law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity [and] [s]tate agent opinions merit significant consideration as well." *Id*. (citing *Brown*, 649 F.3d at 197 n. 2).

ii

The ALJ considered medical opinions from Drs. Ola and Diorio regarding the severity of Ouk's impairments. Dr. Ola is one of Ouk's treating psychiatrists from WES. (R. at 293–96.) She performed a psychiatric evaluation of Ouk on July 26, 2013, about two months after Ouk's suicide attempt. (*Id*.) She noted that Ouk was "casually dressed, kempt, cooperative, and maintained good eye contact." (R. at 295). Ouk's mood was depressed with a sad affect. (*Id*.) She was fully alert, oriented in time place

7

and person, with fair concentration.  (*Id*.)  Her memory, judgment and insight were noted as intact.  (*Id*.)  Dr. Ola recommended medication and individual psychotherapy. (*Id*.)  The report does not contain a narrative explanation or analysis.

Dr. Ola saw Ouk on approximately six additional occasions between 2013 and 2015 and was listed on two documents as a "Supervising Psychiatrist" for Ouk's treatment. (R. at 289, 322, 324, 326, 330, 332, 335, 339.)  Dr. Ola completed a Comprehensive Biopsychosocial Evaluation of Ouk on December 11, 2013.  (R. at 344.)  In that evaluation, the doctor noted that Ouk's general appearance and behavior, cognition, thought content, motor activity and thought process were "unremarkable." (*Id*.)  Ouk's mood was sad and depressed, her insight good, and her judgment average. (*Id*.)  The report contains no narrative explanation or analysis.  The remaining treatment records from Dr. Ola from January 2014 – January 2015 note that Ouk "denies major problems," with one report stating that Ouk's condition was "stable."  (R. at 324, 326, 330, 332, 339.)

On May 20, 2015, Dr. Ola completed a medical source statement, opining on the severity of Ouk's mental impairments.  (R. at 355–56.)  The two-page form consists of a series of questions followed by a limited set of answers from which Dr. Ola circled the appropriate answer.  (*Id*.)  The first three questions asked Dr. Ola to select Ouk's "degree of impairment" in certain areas, providing the following options: None, Mild, Moderate, Marked or Extreme.  Dr. Ola circled mild for activities of daily living, moderate for social functioning, and moderate for ability to maintain concentration, persistence or pace.  (R. at 355.)  Dr. Ola then answered "three" when asked to give the

number of times Ouk had experienced "exacerbation or temporary increase in symptoms" over the preceding twelve months. (*Id.*)

The next series of questions asked whether Ouk has a "substantial loss of ability to perform the following functions": understand, carry out and remember simple instructions, make simple work-related decisions, respond appropriately to supervision, co-workers and work situations, and deal with changes in routine work setting. Dr. Ola circled "no," indicating no substantial loss of ability to perform for all functions. (R. at 355.) The final series of questions asked whether Ouk was precluded from specified activities. Dr. Ola indicated that Ouk was "precluded" from maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, completing a normal work day or week without interruption from psychological symptoms, preforming at a consistent pace without unreasonable breaks, and accepting instructions and responding appropriately to criticism from supervisors. (R. at 356.) She circled that Ouk was "not precluded" from maintaining her attention for 2-hour segments. (*Id.*) Dr. Ola did not elaborate or provide any explanation or justification for her findings. (R. at 355–56.)

Dr. Diorio, a state agency consultant, offered a different opinion. Dr. Diorio considered Ouk's available records as of October 7, 2013, including Ouk's hospital discharge summary (R. at 202–84), Dr. Ola's July Psychosocial Evaluation (R. at 293–96), Ouk's treatment notes through September 2013 (R. at 285–316) and Ouk's Function Report (R. at 164–71). Dr. Diorio found that Ouk suffered from a severe affective disorder that moderately limited her activities of daily living, social

9

functioning, and concentration, persistence or pace. (R. at 76.) Dr. Diorio did not find any episodes of decompensation. (*Id.*)

Dr. Diorio concluded that Ouk had moderate limitations in the following categories: ability to carry out detailed instructions, maintain attention and concentration for extended periods, make simple work-related decisions, complete a normal work day or week without interruption from psychological symptoms, preform at a consistent pace without unreasonable breaks, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. at 77–78.) Dr. Diorio otherwise found Ouk "not significantly limited." (*Id.*)

Dr. Diorio explained that Ouk "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. at 78.) "She is capable of asking simple questions and accepting instruction." (*Id.*) Dr. Diorio found that Ouk can maintain socially appropriate behavior and that her activities of daily living and social skills are functional. (*Id.*) She further concluded, based on the evidence, that Ouk "would be able to maintain regular attendance and be punctual." (*Id.*) Dr. Diorio explained that she found Ouk's claimed limitations only partially credible in light of the record evidence and that she assigned appropriate weight to the Global Assessment of Functioning (GAF) scores[5] in the record. (R. at 76, 78.)

---

[5] "A GAF score is a numerical summary of a clinician's judgment of an individual's overall level of functioning." *Nixon v. Colvin*, 190 F. Supp. 3d 444, 447 (E.D. Pa. 2016) (quotations omitted). The GAF scale is "used by mental health professionals to assess current treatment needs and provide a prognosis." *Id.* A score of "50 or below indicates serious symptoms, while a GAF score of

10

In light of the conflicting opinions and after reviewing the record evidence, the ALJ decided to assign "no more than partial weight" to Dr. Ola's opinions while assigning "great weight" to those of Dr. Diorio. (R. at 21–22.) Her decision to do so is supported by substantial evidence. The ALJ found Dr. Ola's opinions to be unexplained, internally inconsistent and unsupported by the record. (*Id.* at 21.) Dr. Ola's report consists of two pages of circled answers and a signature. As the Third Circuit has stated, "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best . . . [and] where these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect.'" *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (citing *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)).

Further, Dr. Ola's report is inherently contradictory—she opines that Ouk is both able to understand and carry out simple instructions and respond appropriately to supervision and work situations while also being precluded from accepting instructions and responding appropriately to criticism from supervisors. (*Compare* R. at 355, *with* R. at 356.) Finally, the record medical evidence lacks of any indication that Ouk is subject to such extreme limitations. Treatment records, including Dr. Ola's, consistently note only mild or moderate limitations and routine treatment after Ouk's release from the hospital. (R. at 295 (fully alert, memory intact, concentration fair,

---

51 through 60 indicates moderate symptoms." *Id*. Over the course of her treatment at WES, Ouk's GAF scores ranged from 52 – 58. (*See* R. at 289, 295, 308.)

In recent years, the GAF scale has "fallen somewhat into disfavor," however the Social Security Administration continues to receive and consider GAF in medical evidence and adjudicators consider GAF scores with all of the relevant evidence in the case file. *Nixon*, 190 F. Supp. 3d at 447 (quotations omitted).

judgment intact, GAF 56, treatment recommendation medication and individual psychotherapy); R. at 301–02 (Ouk was "early for her appointment and was properly dressed" with a GAF of 52); R. at 304 (cooperative with intact thought process, memory, concentration, attention and judgment); R. at 324 (GAF 52 and Ouk "denies major problems"); R. at 326 (GAF 52 and Ouk "stable").)

In contrast, the ALJ found Dr. Diorio's opinion to be "well considered and well supported" by the medical evidence (R. at 22), a decision that is supported by substantial evidence. Dr. Diorio's conclusion that Ouk is able to meet the mental demands of competitive work was based on a comprehensive review of the records available to her at the time. Her opinions are supported by Ouk's GAF scores, which ranged from 52 – 58 following her release from the hospital (R. at 289, 295, 308), as well as her daily and social activities, including living with and caring for her ill and aging parents (R. at 303), running family errands (R. at 303), and spending time with friends (R. at 290). Further, Dr. Diorio's opinions are consistent with the records postdating her report. Ouk's GAF scores were consistently 52 (R. at 322, 324, 326, 335, 339, 345, 354), and her progress notes show increased daily activities and social functioning. Ouk obtained a part-time job working at a friend's nail salon (R. at 347) and cared for a woman at night (R. at 338). Ouk reported "doing well," dating, and being excited and happy about a birthday party her friends were throwing. (R. at 328.) She also reported being a good mother and a hard worker and that she does a lot for people and likes to help them. (R. at 322.)

Ouk contends that Dr. Diorio's failure to take Dr. Ola's May 2015 evaluation into account renders her report unreliable. ALJs, however, are permitted to rely on state

12

agency consultant's opinions rendered during the course of a claimant's treatment, when the consultants have access only to those records available at the time.  ALJs do not need expert medical advice on every fact supporting their RFC decision.  *See Chandler*, 667 F.3d at 361–62.  An ALJ is only required to obtain an updated consultant report if additional medical evidence is received that the ALJ believes would change the consultant's finding "that the impairment(s) is not equivalent in severity to any impairment in the Listing."  *Id*. at 361.  As previously explained, the ALJ found Dr. Diorio's opinion consistent with the subsequent medical records and Dr. Ola's report only partially credible, and her decision was supported by substantial evidence.  The ALJ properly considered the expert opinion evidence and made permissible choices regarding the weight assigned to each.

B

Ouk next argues that the ALJ erred in concluding that Ouk was not entirely credible without providing a reasonable explanation for her decision. (Pl.'s Br. at 12–17.)  In determining whether there is substantial evidence to support an ALJ's decision, courts owe deference to the ALJ's assessment of the credibility of witnesses.  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009); *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (citation omitted) (The Court "ordinarily defer[s] to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.").  However, the ALJ "cannot reject evidence for an incorrect or unsupported reason" and "must specifically identify and explain" what evidence was found not credible and why.  *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir. 2014) (citations omitted).  Inconsistencies in a claimant's testimony or discrepancies between

13

the alleged severity of the disability and the claimant's daily activities are legitimate bases for the ALJ to find the claimant's testimony on symptom severity not fully credible. *See, e.g.*, *Burns v. Barnhart*, 312 F.3d 113, 129 – 130 (3d Cir. 2002).

In her Function Report, Ouk claimed that her depression made her "unsociable with the public." (R. at 164.) Where previously she was "very active and very sociable," now she doesn't like to go out alone because she is "afraid of other people" and she is "less sociable, more to [her]self." (R. at 165, 167, 169.) Ouk stated that on a normal day "when [she] wake[s] up, [she] stay[s] in the house and go outside for a little bit[] and watch TV and then go to sleep." (R. at 165.) She stated that she has forgotten how to cook and has no hobbies but will sit and talk with others approximately once a week. (R. at 166, 168.) Her condition "affect[s] [her] motivation to do anything." (R. at 169.)

Ouk painted a similar picture of a secluded life at the hearing. When asked by the ALJ why she felt she was unable to work, Ouk replied that "I feel scared. I can't even go outside. I don't even go outside, [] I'm scared of everything . . . I can't socialize [with] other people[.]" (R. at 45.) She continued, "I don't even talk to my son. I don't talk to nobody and I end up like by myself." (*Id*.) Ouk testified that she hears voices every day, telling her, for example, not to go downstairs or outside because it's not safe. (R. at 46–47.) Ouk told that ALJ that she does not "get along with nobody. The only person I get along with is my brother, that's it, one brother. Everybody is getting on my nerve. . . . My son get on my nerves too." (R. at 55–56.) Ouk testified that she believes her children hate her and that she has no friends except for one best friend. (R. at 58.) When asked to describe a typical day, Ouk said, "When I get up, I don't do nothing. I

just stay in bed all day long. . . . I don't watch TV. . . . I just look out the window, see the car go by." (R. at 57.)

The ALJ found Ouk not entirely credible in light of discrepancies in her testimony and the documentary evidence. (R. at 21.) Specifically, the ALJ found that Ouk's claims of "social withdrawal" and an inability to do anything were contradicted by Ouk's mental health treatment records that evidenced a modest social and personal life. (R. at 21.) A review of the treatment notes show that the ALJ's decision is supported by substantial evidence. By way of example, August 19, 2013 treatment notes indicate that Ouk had a better week because she spent more time with friends (R. at 290), September 10, 2013 treatment notes state that Ouk likes to run and go to the park and that she considers her willingness to help others a strength (R. at 287), November 12, 2013 treatment notes state that Ouk's brother was upset with her for coming in late and never being home and she reported that she was considering getting a part-time job and going back to work at a nail salon (R. at 349), November 26, 2013 treatment notes provide that Ouk began working part-time at a friend's nail salon (R. at 347), April 17, 2014 treatment notes indicate that Ouk works nights caring for a woman, she has been talking with her daughter, and was planning a birthday party for her son where she intended to see all of her children (R. at 338), May 1, 2014 treatment notes state that Ouk is very supportive of her son and tries to talk to him although he doesn't always share his feelings (R. at 337), and October 15, 2014 treatment notes reveal that Ouk was planning a trip to Maryland to visit friends and family and that she was excited for her birthday party that her friends were planning her (R. at 328).

15

The ALJ noted some of these inconsistencies, among others, and resolved them in a reasonable manner. Rather than disregarding Ouk's testimony in its entirety, the ALJ decided to accord her testimony "no more than partial weight." (R. at 21.)

C

Ouk also claims that the ALJ "did not reasonably explain" or identify satisfactory evidence supporting her assessment of Ouk's RFC. (Pl.'s Br. at 17–18.) The ALJ is responsible for assessing and determining the claimant's RFC, 20 C.F.R. § 416.946(c), by considering all of the relevant medical and other evidence in the record, 20 C.F.R. § 416.945(a)(3). *See also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). "[T]he ALJ should accompany its RFC finding with 'a clear and satisfactory explication of the basis on which it rests.'" *Santiago v. Barnhart*, 367 F. Supp. 2d 728, 732 (E.D. Pa. 2005) (quoting *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001)). "Although reliance on State consultants' and treating physicians' opinions is common and ALJs are required to consider any existing State consultant reports, the regulations do not require ALJs to seek outside expert assistance." *Chandler*, 667 F.3d at 362 (citations omitted).

The ALJ considered all relevant evidence and adequately discussed the bases for her RFC determination. Specifically, the ALJ considered (1) the medical reports and treatment records from Ouk's mental health care providers including Dr. Ola, (2) Ouk's testimony concerning her abilities and limitations, and (3) Dr. Diorio's opinions. (*See* R. at 17–21.) Her RFC analysis and explanation was thorough, recounting Ouk's many

alleged limitations and providing her treatment history in extensive detail. (*Id.*) When she assigned limited or partial weight to evidence, she explained her reasons for doing so which, as explained above, are supported by substantial evidence. After considering and weighing all of the evidence, the ALJ determined Ouk's RFC, taking into account all of Ouk's credibly established limitations.

Ouk argues that the ALJ's decision cannot be based on a "mere summarization of medical records" and that the only medical support for that decision is Dr. Diorio's opinion, which she believes is flawed. She claims that Dr. Diorio's opinion was not based on Ouk's full treatment records and that her opinion inappropriately relied on an inadvertently supplied record pertaining to another individual.

First, as explained above, the ALJ's assessment was thorough and comprehensive, taking into account the medical records and opinions of Ouk and her treating physician, albeit with limited weight. Second, as the Third Circuit held in *Chandler*, the mere fact that the record continued to develop after the consultant's report does not prohibit the ALJ from relying on the report, so long as the ALJ does not receive evidence that he or she believes would change the consultant's finding. *Chandler*, 667 F.3d at 362. Here, the ALJ found the consultant's report to be "well considered and well supported" by the medical evidence available to her at the time, and that "the additional evidence now in the record does not call into question the conclusions of the [consultant]." (R. at 22.) As previously stated, an independent

17

review of the record, which does not include the inadvertently produced document,[6] confirms that the ALJ's decision was supported by substantial evidence.[7]

D

Finally, Ouk contends that her due process rights were violated when the ALJ denied her request to subpoena Dr. Diorio. Ouk contends that she has the "absolute right" to cross-examine any source of adverse evidence. (Pl.'s Br. at 22.) Her argument is based on the Supreme Court's decision in *Richardson v. Perales*, 402 U.S. 389 (1971) and the Third Circuit Court of Appeals' decision in *Wallace v. Bowen*, 869 F.2d 187 (3d Cir. 1988). Neither case provides Ouk with such an absolute right. *See Richardson*, 402 U.S. at 402 ("[A] written report by a licensed physician . . . may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination . . . may constitute substantial evidence . . . when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination[.]"); *Wallace*, 869 F.2d at 193 (holding claimant must have the opportunity to cross-examine expert who authors a post-hearing report when "necessary to the full presentation of the case"). Further, the majority of circuit courts to address this issue have concluded that the right to cross-examination is not absolute. *See also Passmore v. Astrue*, 533 F.3d 658, 664 (8th Cir. 2008) (holding that the issuance of a subpoena is a matter committed to the discretion

---

[6] The records considered by Dr. Diorio apparently contained an Adult Third Party Functional Report related to another claimant. (R. at 74.) This error was brought to the ALJ's attention at the hearing and the document was removed from the record. (R. at 32.)

[7] Ouk further objects that the ALJ's RFC does not take into account all of the limitations found by Dr. Diorio. (Pl.'s Br. at 20.) She contends that the Vocational Expert did not rule out detailed work based on Dr. Diorio's finding that Ouk can carry out simple instructions. (*Id.*) Her argument is essentially that Dr. Diorio's finding that Ouk can carry out simple instructions necessarily means that she cannot carry out detailed instructions. In fact, Dr. Diorio found Ouk capable of carrying out detailed instructions with only moderate limitation. (R. at 77.)

of the ALJ); *Yancey v. Apfel*, 145 F.3d 106, 112 (2d Cir. 1998) (same); *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996) (holding due process does not afford a social security claimant an absolute right to cross-examine). *But see Lidy v. Sullivan*, 911 F.2d 1075 (5th Cir. 1990) (holding social security claimants have an absolute right to cross-examine a reporting physician).

The Regulations provide that ALJs, on their own initiative or upon request, may issue subpoenas for the testimony of witnesses when "reasonably necessary for the full presentation of a case." 20 C.F.R. § 404.950(d)(1); *Wallace*, 869 F.2d at 194 ("[W]hether cross-examination of the author of a report is necessary for a full and true disclosure of the facts, is a question entrusted to the ALJ in the first instance."). Parties who wish to subpoena witnesses must file a written request that, among other things, "state[s] the important facts that the witness . . . is expected to prove[] and indicate why these facts could not be proven without a subpoena." 20 C.F.R. § 404.950(d)(2).

Ouk's counsel sent a letter to the ALJ requesting that she subpoena Dr. Diorio so counsel could "test her credibility by cross examination" and, alternatively, objected to the use of Dr. Diorio's report if she was not made available. (Pl.'s Br., Ex. B.) The request does not attempt to state what information counsel expected to illicit during cross-examination or explain why such information could not be obtained through other means, such as written interrogatories. Further, counsel had ample opportunity to rebut the report and did so by submitting Dr. Ola's assessment. Thus, without any information suggesting the necessity or import of Dr. Diorio's testimony, the ALJ exercised her discretion to deny the request for cross-examination. (R. at 13, 31.) *See Passmore*, 533 F.3d at 666 (holding ALJ did not abuse discretion where claimant failed

19

to establish cross-examination of subpoenaed physician was reasonably necessary where he failed to show the import of the testimony or why interrogatories were not sufficient).

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.
